Filed 12/1/20  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDREW DARNELL JOHNSON,<br><br>    Defendant and Appellant. | C080001<br><br>(Super. Ct. No. 11F08807) |

M.N. interrupted defendant Andrew Darnell Johnson while he was breaking into a window near the front door of her house.  Defendant fled and was apprehended a short time later with a screwdriver and gloves.  A jury found him guilty of first degree residential burglary and possession of burglary tools, and he was sentenced to an aggregate term of nine years in state prison.

On appeal, defendant contends the trial court erroneously permitted the prosecutor to present evidence of his prior 2008 burglary conviction under Evidence Code section

1

1101[1] to show intent or lack of accident or mistake. He attacks the court's ruling permitting the prior crime evidence on several grounds, including: (1) intent was not an issue at trial since he offered to stipulate that the person M.N. encountered, which he denied was him, had the requisite intent to steal; (2) the prior burglary crime and the charged offense were not sufficiently similar for purposes of section 1101, subdivision (b); (3) the prior crime evidence was more prejudicial than probative under section 352; and (4) admitting the evidence violated his federal constitutional rights to due process and a fair trial. Defendant also contends recent legislative amendments in Senate Bill No. 1393 (2017-2018 Reg. Sess.) require remand for the court to consider whether to exercise newly granted discretion to strike the prior serious felony enhancement imposed under Penal Code section 667, subdivision (a)(1).

We shall affirm defendant's convictions, but remand for the court to determine whether to exercise its discretion to strike the prior serious felony enhancement.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2011 M.N. lived with her brother, daughter, and a college student at her home in Sacramento. The house had a gate separating the front yard from the front door; it was necessary to enter the gate before approaching the front door. To the left of the front door was a screened window to a bedroom. A small table and chair were positioned below the window in a small patio area.

On the morning of December 28, 2011, M.N. and her brother left the house to run a quick errand; M.N.'s daughter and the college student were not at home at the time. When they left, the screen to the window near the front door was in place, the window was closed and locked, and the gate leading to the front door was closed.

---

[1] Further undesignated statutory references are to the Evidence Code.

M.N. and her brother went to a store a short distance from the house and returned home a few minutes later, about 10:35 a.m. When they returned, M.N.'s brother went to the garbage cans on the side of the house while M.N. walked towards the front door; she noticed the gate was open and unlatched even though it was closed before she left. M.N. saw a young Black man hiding behind a plant near the front bedroom window. She asked him who he was and what he was doing there; he responded that he was looking for someone named Michael. M.N. said she did not know anyone named Michael. While they spoke, M.N. and the man were about two feet apart.

The man walked toward M.N., causing her to back out of the gated area. M.N.'s brother came up behind her and she told him that someone was there. Her brother wanted to fight or grab the young man, but M.N. told him not to grab him. M.N.'s brother told her that the screen from the front window had been removed and the window was open. When M.N. turned to look at the window, the man fled.

Shortly thereafter, M.N.'s other daughter, who did not live with her, arrived at the house. M.N. and her daughter drove through the neighborhood looking for the man, and called 911 about 10:40 a.m. to report the break-in. M.N. reported that the man was a young Black man, in his early twenties, with a mustache. He was wearing a navy blue hoody shirt and light blue pants with a black knitted cap. The man had hopped over a fence and was in a nearby park.

Around this same time, Lorena G., who lived near M.N., called 911 to report that a Black man had jumped over her neighbor's fence into her yard. He was wearing a blue beanie and a blue sweatshirt or jacket and dark pants. She described the man as approximately 30 to 40 years old during the 911 call. When questioned at trial whether she felt this description was accurate, Lorena G. testified that she did not see his face, but only his hand as he jumped over the fence, which she thought "looked young."

Several officers responded to the area, including Officer Randy Van Dusen and his police dog Bodie; he was dispatched to the scene around 10:44 a.m. Bodie was trained to

search for outdoor articles that had a fresh human scent. In a backyard near Lorena G.'s home, Bodie found a blue jacket and a black beanie that had recently been discarded. Officer Van Dusen broadcasted on the radio that he had found clothing that matched the suspect's clothing.

Officer Patricia Verozza, who also responded to the call, spoke with a local resident who told her that someone ran by his driveway about five minutes before the officer arrived. The person was wearing a white T-shirt and light blue pants. After hearing Officer Van Dusen's broadcast about the discarded clothing, Officer Verozza believed that the resident had seen the suspect.

Another officer broadcast on the police radio that someone who matched the suspect's description was walking on a bike trail in the area. Officer Verozza proceeded to the bike trial and saw defendant, who was wearing jeans and a white T-shirt with dirt, weeds, and brush on it. She detained him at 11:12 a.m.

Defendant was approximately one mile from M.N.'s home when he was detained. He had a screwdriver and purple gloves in his possession. Defendant also had a mustache and facial hair.

Officer Zach Eaton escorted M.N. to a field showup, where she identified defendant as the person she previously encountered breaking into her home. Defendant was then transported for M.N.'s brother to see, but he was not able to identify defendant.

Defendant was charged with first degree residential burglary (Pen. Code, § 459, count one) and misdemeanor possession of burglary tools (Pen. Code, § 466, count two). It was further alleged that defendant suffered a prior serious felony conviction (Pen. Code, § 667, subd. (a)), a prior strike (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), and a prior prison term (Pen. Code, § 667.5, subd. (b)).

Prior to trial, the prosecutor moved in limine to admit two prior burglary convictions under section 1101, subdivision (b)—one from 2006 and one from 2008—in order to prove defendant's intent or absence of mistake in breaking into M.N.'s home.

4

The prosecutor argued that the 2008 burglary and the present offense were similar; defendant had broken into a stranger's home while she was at work, rummaged through jewelry without actually taking anything, and then fled the scene while discarding clothing.

Defense counsel objected, arguing the prior crimes' evidence was inadmissible under section 1101 because defendant did not contest the intent element but rather claimed that he was not the man at M.N.'s house.  She also argued that the prior burglaries were not sufficiently similar and were too inflammatory to admit.  Defense counsel offered to stipulate that the man at M.N.'s house, whoever he was, had the requisite intent to steal for purposes of the burglary charge.

The trial court ruled the prosecutor could introduce one of defendant's prior burglaries under section 1101, subdivision (b), but not both.  While one was relevant to show intent or lack of mistake or accident, both the prior burglaries would have been too prejudicial to defendant.  The court also found that the prosecutor was not required to accept defendant's offer to stipulate to intent.

At trial, M.N. again identified defendant as the man who broke into her home.  She testified that she was approximately two feet from defendant when she spoke to him at her house.  She was wearing her glasses when she identified him during the field showup.  The window screen, according to her, had been bent in the corners, but the marks did not appear to her to be pry marks; the screen was not bent before she left the house that day.

M.N.'s brother was unable to identify defendant at trial.[2]  He said he could not remember many details because it had been four years since the break-in.  Although he admitted talking to police the day of the incident, and he conceded that his memory was

---

[2]  The brother was a reluctant trial witness, who did not want to testify.

better than it was at trial, he later denied telling police that the young Black man he saw was five foot nine or five foot 10 inches tall, about 160 pounds, with dreadlocks or possibly a black skull cap, and a jacket. He also denied telling police the window screen had pry marks on it.

Officer Eaton later testified that M.N.'s brother had given the above description to him the day of the incident, and had said that the window screen had pry marks on it that had not been there before. Likewise, M.N. had told him the screen had pry marks that were not there before. Officer Eaton also saw the screen when he responded to the scene and testified that the screen had pry marks on it.

A DNA expert testified at trial regarding tests she conducted on the jacket and beanie recovered by police. After testing two samples from the jacket, the results were inconclusive. The expert also tested two samples from the beanie. Tests on the first beanie sample showed two contributors, a male and a female, and that defendant was a possible contributor to DNA found on the sample; the probability of identifying an unrelated African-American contributor to this sample was one in 96 million. As to the second beanie sample, the expert identified at least two DNA contributors, but possibly three. Assuming there were two contributors, defendant's DNA was conclusively identified in the sample, and the probability of identifying an unrelated African-American contributor was one in 190 million. However, if there were three contributors, the results were inconclusive.

The prosecutor also presented evidence that defendant was convicted of burglarizing V.B.'s house in 2008. She called four witnesses who testified, in sum, for about 30 minutes. Defense counsel asked a total of five questions while cross-examining these witnesses.[3]

---

[3] V.B., the homeowner, testified for four minutes and defense counsel did not ask any questions on cross-examination. V.B.'s neighbor testified for five minutes and defense

6

According to the witnesses, V.B. was at work when her neighbor saw someone standing outside V.B.'s house the neighbor had never seen before. The neighbor heard a door open and close from the direction of V.B.'s house and called police. The sliding glass door to V.B.'s house had pry marks, and another door was kicked in. The intruders had gone through the bedroom, dresser, and jewelry cabinet, although nothing was taken. A responding officer saw defendant jump over a backyard fence; defendant was removing items of clothing as he fled. The officer chased defendant and eventually detained him. The parties stipulated that defendant pleaded no contest to burglary for his role in the incident.

Defendant did not testify, but defense counsel called a private investigator with experience investigating crimes in the area surrounding M.N.'s home. The area was comprised of a mix of racial groups.

The jury found defendant guilty as charged. Defendant waived a jury trial on the prior conviction allegations, and the court found the prior conviction true. The court imposed an aggregate term of nine years in state prison; the low term of two years for the burglary offense, doubled to four years for the strike prior, plus five years for the prior serious felony conviction. The court imposed and stayed a two-year term for the possession of burglary tools offense. (Pen. Code, § 654.) Defendant timely appealed.

counsel asked one question on cross-examination. Officer Marcel Loriaux testified for nine minutes, and defense counsel asked three questions during cross. Officer Cynthia Bohrer initially testified for seven minutes, and defense counsel declined to ask any questions on cross. The prosecutor recalled her to ask a single question, and defense counsel asked one question on cross.

## DISCUSSION

### I

*Evidence of Prior Burglary*

Defendant contends the trial court improperly admitted evidence of his prior 2008 burglary conviction under section 1101, subdivision (b) to prove intent and absence of mistake or accident. He argues the element of intent was not in dispute because he offered to stipulate that the person M.N. encountered had the requisite intent to steal; defendant simply denied being that person. Thus, in his view, identity was the only issue at trial. He also contends that the prior burglary was not sufficiently similar to the charged crime and that the probative value of the evidence under section 352 was substantially outweighed by the undue risk of prejudice.

Section 1101 controls the admission of evidence of prior conduct. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1113.) Subdivision (a) of section 1101 provides, with exceptions not applicable here: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a); *People v. Leon* (2015) 61 Cal.4th 569, 597 (*Leon*) [" 'Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion' "].)

Evidence that a person committed a crime, civil wrong, or other act may be admitted, however, to prove some other material fact, such as that person's intent, identity, or absence of mistake or accident. (§ 1101, subd. (b); *Leon, supra*, 61 Cal.4th at p. 597.) The uncharged act must be relevant to prove a fact at issue (§ 210), and its admission must not be unduly prejudicial, confusing, or time consuming (§ 352). (*Leon*, at pp. 597-598.) We review the trial court's decision whether to admit evidence, including evidence of other crimes, for abuse of discretion. (*Id.* at p. 597.) A trial court's

8

determination " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Relevance under section 1101 depends, in part, on whether the act is sufficiently similar to the current charges to support a rational inference of intent or some other material fact. (*Leon, supra*, 61 Cal.4th at p. 598.) " 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.' " (*Ibid.*) That is, the uncharged misconduct must be sufficiently similar to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [recurrence of a similar result tends to establish, at least provisionally, the presence of criminal intent].)[4]

Defendant first argues that the prior burglary evidence was not relevant because defense counsel offered to stipulate to intent, and he did not argue lack of intent. In essence, he contends the trial court erred by not compelling the prosecutor to accept the proffered stipulation.

Our Supreme Court has held, however, that "[n]either the prosecutor nor the trial court [is] legally obligated" to accept a stipulation. (*People v. Rogers* (2013) 57 Cal.4th 296, 329-330 [prosecutor could properly reject the defendant's offer to stipulate that the charged murder was a first degree or nothing type of case, instead opting to prove intent with prior acts evidence of the defendant's prior uncharged murders].) And a trial court is not authorized to enforce such a stipulation over the prosecutor's objection. (*Ibid.*)

---

[4] The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.) The trial court found that the prior burglary was not sufficiently similar to prove identity. Neither party challenges this finding on appeal.

This is because " '[a] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it.' " (*Id.* at p. 330, quoting *Old Chief v. United States* (1997) 519 U.S. 172, 186-187 [136 L.Ed.2d 574, 592] [conventional evidence "tells a colorful story with descriptive richness"; it "has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum"].)

Defendant's reliance on a much older case, *People v. Hall* (1980) 28 Cal.3d 143, for the proposition that a prosecutor must accept a stipulation, is not persuasive. While it is true *Hall* states that when "a defendant offers to admit the existence of an element of a charged offense, the prosecutor must accept that offer and refrain from introducing evidence . . . to prove that element to the jury" (*id.* at p. 152), more recent cases from our Supreme Court, like *Rogers*, have held otherwise. (See, e.g., *People v. Rogers, supra*, 57 Cal.4th at pp. 325, 329-330; *People v. Scheid* (1997) 16 Cal.4th 1, 16-17 [defense's offer to stipulate as to the fact or manner of the shootings did not negate the relevance of photographic evidence showing murder victim; the prosecutor was not obliged to accept " ' "antiseptic stipulations" ' "]; see also *People v. Thornton* (2000) 85 Cal.App.4th 44, 48 [refusing to revert to the "outmoded notion that a criminal defendant may limit the prosecution's evidence by 'not putting things at issue' "].) We shall follow the court's more recent directive.

Defendant claims that he did not put the element of intent in issue. But he pleaded not guilty to the charges. Such a plea puts the entire charge, including his intent to steal for purposes of the burglary offense, at issue. (*People v. Catlin* (2001) 26 Cal.4th 81, 146 [a defendant's not guilty plea put in issue all the elements of the charged offenses]; *People v. Thornton, supra*, 85 Cal.App.4th at pp. 48-49 [a fact—like a defendant's intent—generally becomes " ' "disputed" ' " when it is raised by a plea of not guilty or a denial of an allegation].)

10

Moreover, during closing argument defense counsel argued the issue of intent to the jury. Counsel stated: "Then, even if you could somehow find that this defendant did these two things to commit a burglary, the burglary is not proven until you can prove *that the reason he is there is to specifically intend to commit the theft* . . . of this residence." (Italics added.) Counsel continued: "Another jury instruction that is *just as important that you will get has to do with the act of union and intent. What that means is whatever was done had to be done with the specific intent -- with the specific intent of doing* [*a theft*]. . . . Like I said, there's no evidence of theft. A taking and carrying away, I don't know what would be alleged to have been taken. There's no burglary and there's no theft." (Italics added.)

In a similar vein, with respect to the possession of burglary tools charge, defense counsel argued: "You will also be given a jury instruction about possession of burglary tools, *and the same point is made with regard to the intent.* A person who is carrying a screwdriver or walking around with a screwdriver or what could be considered a burglary tool is not a burglary tool unless that tool can be used for burglary *and the person is possessing the tool with the specific intent to use it to commit the burglary.*" (Italics added.) Counsel then argued, "And in order to prove that, yes, my client was found he had a screwdriver on his person. But . . . the prosecution would have to prove beyond a reasonable doubt, *that he possessed it with the intent to feloniously . . . break or enter into the building for the purpose of committing the theft . . . .*" (Italics added.)

Thus, while defense counsel argued identity, she also raised the specter of lack of intent. To counter that argument, the trial court properly allowed the prosecutor to reject the stipulation and prove intent using the prior burglary evidence under section 1101, subdivision (b).

Defendant next contends that even if the prosecutor was not required to stipulate to intent, the prior burglary evidence lacked probative value under section 1101, subdivision (b) because it differed significantly from the charged crime. He cites the

11

following differences: (1) the 2008 burglary involved two suspects while the present crime involved a single person; (2) the 2008 burglary occurred at an apartment rather than a single family residence; (3) the 2008 burglary did not have a gated front area; (4) the back door was kicked in during the 2008 burglary whereas a window screen was removed and the window opened here; (5) no burglary tools were found on defendant during the 2008 burglary and he was found with a screwdriver and gloves when detained in the present case; (6) the 2008 burglary involved rummaging through drawers in a bedroom and moving a mattress while no similar evidence was found here; and (7) defendant removed his T-shirt and pants after fleeing the 2008 burglary, but was alleged to have removed only a jacket and hat during the present crimes. In addition, defendant contends that fleeing from a burglary scene by hopping over a fence is not unusual or distinctive.

Although the 2008 burglary and the charged offense were dissimilar in some ways, a reasonable court could conclude that in sum the actions taken by defendant in the earlier burglary were sufficiently similar to admit the evidence to establish intent. Defendant targeted strangers' homes[5] when they were not present. Pry marks were found on a sliding glass door in the earlier case (in addition to the door being kicked in) and on the window screen in the present case. Defendant fled the scene of both crimes while discarding clothing so as not to be identified as the perpetrator. These common features support a finding that defendant harbored a similar intent in each instance to steal from the absent homeowners.

For the same reasons, the prior burglary evidence was admissible to show lack of mistake or accident. In this case, M.N. testified that defendant said he was looking for Michael when she surprised him upon returning to the house. Evidence that defendant

---

[5] The record belies defendant's claim that the 2008 burglary occurred at an apartment. The victim testified that she lived in a home, not an apartment.

12

had previously been convicted of burglarizing a stranger's home in 2008 while the victim was away at work tended to show that he did not have an innocent reason for being at M.N.'s house; he was not mistakenly there looking for someone, with gloves and a screwdriver in his possession.

Admitting evidence of defendant's prior burglary also was not more prejudicial than probative. "Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by a section 352 concern. Evidence may be excluded under section 352 if its probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

Defendant's arguments to the contrary notwithstanding, the trial court's finding that the probative value of the prior burglary evidence outweighed any prejudicial effects was within the bounds of reason. As discussed above, the prior burglary and the present crime shared several common characteristics, meaning the evidence of the prior burglary was probative in establishing defendant's intent and absence of mistake. The prior burglary was not stronger or more inflammatory than the charged crime. And, we note, the court denied the prosecutor's initial request to introduce evidence of two prior burglaries, instead allowing only one prior burglary so as to balance the legitimate need to present relevant evidence with defendant's right not to be unduly prejudiced by the prior crimes evidence. We cannot say on this record that the court abused its discretion in so ruling.

Because the court properly admitted the prior burglary evidence, his constitutional rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the

13

United States Constitution were not violated.[6] *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, upon which defendant relies is not helpful. First, we are not bound by decisions of lower federal courts. (*People v. Bradley* (1969) 1 Cal.3d 80, 86.) In any event, *McKinney* held that a state court's *erroneous* admission of prior crimes' evidence violated the federal due process clause (*McKinney*, at pp. 1384-1386); the prior burglary evidence here was properly admitted.

Even assuming that the court should have excluded the prior burglary evidence, defendant has failed to show prejudice from the purported error under any standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [erroneous admission of evidence warrants reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error"]; *People v. Thompson, supra*, 1 Cal.5th at p. 1116 [the " ' " 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights' " ' "]; *People v. Marks* (2003) 31 Cal.4th 197, 227 [the *Watson* standard of harmless error applies to claims regarding "ordinary rules of evidence like . . . section 352"]; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710] [federal constitutional errors require reversal unless the prosecutor shows the error was harmless beyond a reasonable doubt].)

The record belies defendant's assertion that the prior burglary evidence took up a considerable portion of the trial. While it is true that four witnesses testified about the 2008 burglary, their testimony was relatively short and resulted in minimal cross-examination. The victim of the 2008 burglary testified for approximately four minutes and defense counsel did not cross-exam her. Her neighbor, who called police, testified for about five minutes and defense counsel asked a single question during cross. One of the officers who responded to the scene testified for nine minutes and was asked three

---

[6] To forestall an ineffective assistance of counsel claim for failure to raise the issue, we address defendant's federal constitutional error challenge.

questions on cross-examination. Another officer testified for seven minutes and initially was not cross-examined by defense counsel. The officer was later recalled and both the prosecutor and defense counsel asked a single question upon recall. In total, testimony from the four witnesses took less than a half-hour. By contrast, the DNA expert testified for approximately three hours.

Although the prosecutor briefly referenced the prior burglary evidence during her closing argument, she focused primarily on the eyewitness identification and the physical evidence linking defendant to the present crime. She highlighted that defendant was linked by DNA evidence to clothing matching the description of the suspect's clothing and found discarded in a nearby backyard, that defendant was caught nearby, that he had scratches and dirt on him, which was indicative of someone trying to evade capture, and that he had gloves and a screwdriver on him when apprehended by police. While she did reference the prior burglary evidence, after reviewing the record we cannot say the prosecutor focused exclusively, or even heavily, on the evidence at closing.

Defendant's argument that the evidence was closely contested is equally without merit. His assertion that only two of the four residents at the home testified at trial is true, but irrelevant. The two residents that were home at the time defendant burglarized their home—M.N. and her brother—both testified. The other residents, as M.N. made clear, were not home at the time of the incident and would have added nothing to the testimony. This is especially so since M.N. and her brother both testified that when they left to run errands, no one else was home, the window was closed, and the screen was on the window.

Pry marks on the window screen were consistent with the screwdriver defendant was carrying when he was arrested. While M.N. and her brother testified at trial four years later that the screen showed signs of being bent rather than pried, the day of the incident, when the events were fresh in their minds, both told officers that the screen had

15

pry marks on it.  That observation was confirmed at trial by Officer Eaton, who also viewed the damaged screen.

Citing the fact that he was found walking and not running, defendant implies that he could not have traveled what he characterizes as "some distance" from M.N.'s house to where he was ultimately detained.  Yet the evidence showed that defendant, who was a young man with no sign of any physical impediments, was found a little over a mile from M.N.'s home nearly 30 minutes after M.N. called police.  Several witnesses, including M.N., saw a person matching defendant's description running from the vicinity of M.N.'s home.  Officer Eaton estimated that it would only take a person of similar age, size, and weight approximately six to eight minutes to run about a mile.

While defendant's DNA or fingerprints were not found at M.N.'s house, evidence showed defendant had gloves in his possession when he was detained.  DNA evidence, moreover, did link defendant to the freshly discarded beanie, which M.N. testified defendant was wearing when she first saw him at her house.

Defendant's claim that evidence regarding identity was also closely contested is equally without merit.  M.N. had a conversation with defendant at her house while they stood approximately two feet apart.  She thus had an excellent opportunity to view defendant, making her subsequent identification of him during the field showup highly credible.  Her description of defendant during the 911 call as having a mustache was also accurate, notwithstanding defendant's claim that he had no mustache when he was found.  Defendant cites a picture in the record where his face is turned down, away from the camera.  But another picture shown to the jury clearly shows defendant facing towards the camera with a mustache, and Officer Verozza also testified that defendant had a mustache the day he was arrested.

Defendant was approximately 21 years old when apprehended.  M.N. reported that the person who burglarized her home was around 19 or 20 years old.  Similarly, M.N.'s brother described the man as young; he estimated he was between 21 and 23 years old.

16

And while the neighbor who reported seeing a Black man jump over her fence described the man as 30 or 40 years old, she clarified at trial that she did not see his face but described him as being 30 or 40 years old because she thought his hand looked "young." Thus, three eyewitnesses described the suspect as being young, which defendant was at the time.

M.N.'s brother, moreover, did not merely report that the suspect had dreadlocks as defendant implies. Instead, he reported that he thought the man had dreadlocks or that he could have been wearing a "skull" or beanie cap. DNA evidence linked defendant to the beanie found in a nearby neighbor's backyard.

The fact that defendant was handcuffed when M.N. viewed defendant during the single-person showup does not mean the field showup was "highly-suggestive" as defendant claims. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 386 [single-person showup is not inherently unfair; mere presence of handcuffs on a detained suspect is not so unduly suggestive as to taint the identification].) Officer Eaton testified that he admonished M.N. before the showup with the following: "Number 1: You will be asked to view a person who has been contacted by the police. [¶] Number 2: The person you are going to view may or may not be the subject you observed commit the crime. [¶] Number 3: You are under no obligation to identify the person. If you identify the person as the subject you saw commit the crime, you will not be told if it is the person who is suspected of committing the crime. [¶] Number 4: Please keep an open mind when viewing the person and explain to the officer why or why not the person is the suspect. [¶] Number 5: Please do not take into consideration if the person is handcuffed or removed from a police vehicle. [¶] Number 6: Please do not discuss the field showup with any other people." Furthermore, while M.N. viewed defendant while she remained in the police car, she testified that she wore her glasses during the showup and easily identified defendant. According to Officer Eaton, M.N. identified defendant right away and was "very sure" of her identification.

17

Defendant's assertion that the jury did not decide the case quickly and had questions during deliberations does not mean the evidence was as close as he contends. A careful review of the record reveals that the jury deliberated for about 20 minutes the first day it got the case. Much of that time was likely spent picking a jury foreman since the court instructed the jury that the first thing they must do was pick a foreman. (CALCRIM No. 3550 ["When you go to the jury room, the first thing you should do is choose a foreperson"].) The next day the jury deliberated a full day without reaching a verdict. The following day, before deliberations began, the court released an ill juror and replaced her with an alternate. The jury had to begin deliberations anew, and reached a verdict less than an hour later. Thus, the jury, as reconstituted, reached its verdict quickly, and the original jury had deliberated for only about one day before the alternate was seated. And, one of the jury's questions focused on whether removing a screen constituted entry into the home under the burglary statute, not anything related to identity or intent.

Any prejudice from the prior burglary evidence was also lessened because the evidence actually allowed defense counsel to argue that defendant admitted guilt in the prior incident *because* he had in fact committed the prior burglary. By contrast, defendant went to trial in this case because he was *not* the person M.N. confronted at her home and *did not* commit the charged burglary.

Finally, the court instructed the jury that it could only consider the prior burglary evidence for the purpose of showing defendant's intent or the absence of mistake. Jurors are presumed to follow the court's instruction, and no evidence here shows the jurors disregarded the court's instruction. (*People v. Edwards* (2013) 57 Cal.4th 658, 746 [Supreme Court presumes jurors understand and follow the trial court's instructions].)

For all these reasons, admission of the prior burglary evidence was not prejudicial under any standard. (*People v. Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.) We are convinced beyond a reasonable doubt that

18

the jury would have reached the same verdict had the prior burglary evidence been excluded.

II

*Prior Serious Felony Enhancement*

Defendant contends recent legislative amendments in Senate Bill No. 1393 (2017-2018 Reg. Sess.) require remand for the court to consider whether to exercise newly granted discretion to strike the prior serious felony enhancement imposed under Penal Code section 667, subdivision (a). The People concede the legislation applies retroactively to defendant, and that remand is proper under the circumstances. We agree.

As previously noted, defendant's sentence in this case includes a five-year term for a prior serious felony conviction under Penal Code section 667, subdivision (a). When he was sentenced, the trial court had no power to strike the prior serious felony enhancement. (See *People v. Valencia* (1989) 207 Cal.App.3d 1042, 1045; see also, former Pen. Code, §§ 667, subd. (a)(1) [prior serious felony enhancements shall be imposed "[i]n compliance with [former] subdivision (b) of Section 1385"], former 1385, subd. (b) ["This section does not authorize a judge to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667"].) Recent amendments in Senate Bill No. 1393 to Penal Code section 667, subdivision (a) and Penal Code section 1385, subdivision (b), which became effective January 1, 2019, now give trial courts the power to strike the five-year enhancement for a prior serious felony conviction. (Stats. 2018, ch. 1013, §§ 1, 2 [deleting the prohibition against striking a prior serious felony enhancement]; Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a); *People v. Camba* (1996) 50 Cal.App.4th 857, 865.)

We agree the statutory amendments apply retroactively to defendant. Under *In re Estrada* (1965) 63 Cal.2d 740, 745, "when a statute mitigating punishment becomes effective after the commission of the prohibited act but before final judgment the lesser punishment provided by the new law should be imposed in the absence of an express

19

statement to the contrary by the Legislature." (*People v. Francis* (1969) 71 Cal.2d 66, 75-76.)  As the Supreme Court stated in *Estrada*, "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act.  It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada*, at p. 745.)

Defendant should have an opportunity to argue to the trial court that it should exercise its informed discretion to strike the prior serious felony enhancement.  We therefore remand for this purpose.

## DISPOSITION

Defendant's convictions are affirmed.  The matter is remanded to allow the trial court to determine whether to exercise its discretion to strike the prior serious felony enhancement imposed under Penal Code section 667, subdivision (a).


                                                                       _____/s/_____

                                                                      RAYE, P. J.


We concur:


_____/s/_____
BLEASE, J.


_____/s/_____
RENNER, J.

20